UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
KARA TESORIERO and
KRISTA TESORIERO,

                              Plaintiffs,

                                                    **MEMORANDUM & ORDER**
                                                    02-CV-4348 (DRH) (WDW)

              - against -

SYOSSET CENTRAL SCHOOL DISTRICT
and THOMAS CASEY,

                              Defendants.
----------------------------------------------------------X
**A P P E A R A N C E S :**

**JASPAN SCHLESINGER HOFFMAN LLP**
Attorneys for Plaintiffs
300 Garden City Plaza
Garden City, New York 11530
By:  Laurel J. Kretzing, Esq., Amy J. Weisinger, Esq.

**LAMB & BARNOSKY, LLP**
Attorneys for Defendant Syosset Central School District
534 Broadhollow Road, Suite 210
Melville, New York 11747-9034
By:  Robert H. Cohen, Esq., Diane L. Leonardo-Beckmann, Esq.

**THOMAS F. LIOTTI, ESQ.**
Attorney For Defendant Thomas Casey
600 Old Country Road, Suite 530
Garden City, New York 11530

**HURLEY, District Judge:**

*INTRODUCTION*

-1-

Kara and Krista Tesoriero allege that while they were students at Syosset Senior High School, they were sexually harassed by their teacher. They brought the present action against the teacher, Thomas Casey, and against the Syosset Central School District, claiming violations of Title IX; violations of the New York Human Rights Law; negligent hiring, retention, and supervision; and intentional infliction of emotional harm. Both Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, Casey's motion is granted in its entirety, and the District's motion is granted in part and denied in part.

## BACKGROUND

Syosset Senior High School ("the high school") and the Syosset Central School District ("the District") are located in Nassau County, New York. At the time of the events in question, the high school's principal was Dr. Jorge Schneider, and its assistant principal was Michael Collins. According to Collins, his primary duty as assistant principal was the "supervision of the guidance and pupil personnel services in the building." According to Collins, the high school administration "generally encourage[s] the staff . . . to report [claims of sexual harassment] to an administrator or supervisor as soon as possible"; Collins considers himself to be one of the supervisors to whom such incidents should be reported. Collins Depo. at 5-6. Schneider in turn states that as Principal, "I'm in charge of everything," including making sure that teachers conduct themselves properly. But Schneider states that beyond "speaking to," "counseling," and "advising people about proper behavior," "[d]iscipline really

is up to the district," and "if something happens that isn't appropriate, usually I report it immediately to the superintendent and the superintendent gives me guidelines on how to follow it." Schneider Depo at 11-13.

Kara Tesoriero ("Kara") and Krista Tesoriero ("Krista") are twin sisters born on April 15, 1984. Both were track and field athletes while in high school. In the 2000-2001 school year, while juniors, they were assigned to a history class taught by Casey, a tenured teacher. The Tesorieros claim that early in the school year, Casey began treating them differently than he treated the other students, singling both out for attention in class. Kara Dec. ¶ 4, Krista Dec. ¶ 4.

According to Krista, "[a]t the beginning of the year [Casey] assigned the class board work," "came over to sit with me," and "talked to me the entire class period." Krista Dec. ¶ 5. Krista asserts that "[o]n numerous occasions throughout my junior year, Casey commented on my physical appearance and made physical contact with my body"; Casey "would look at my body up and down and tell me that I 'looked terrific,' " and "touched my hip and told me if he thought I looked nice on that particular day." Krista also alleges that "[o]nce, when I was upset he told me to wait for him in an empty classroom, he asked me to tell him what was bothering me. I told him and he kissed the top of my head and hugged me." Krista Dec. ¶ 7.

Kara states that Casey "often complimented my physical appearance," "would look me over and tell me he liked girls with an athletic figure like I had," "told me that I was beautiful," "told me that he thought my eyes were beautiful," and "would tell me I looked

fantastic or terrific in a particular outfit," and that "[o]ften, he would touch my shoulder, hip or waist when he said these things." Kara Dec. ¶5. Kara also states that Casey "would ask me to stay after class," and "encouraged me to come to his classroom after school so we could talk at the end of the day." Kara further states that Casey was assigned to "hall duty" during her scheduled free period; after she stopped by "sporadically" to say hello, he "began asking me if I was going to stop by and brought a chair for me so I could sit next to him." Kara states that "[s]oon, I spent every eighth period with him." Kara Dec. ¶4. According to Kara, during her visits with Casey, he "would confide in me and discuss his personal life with me," including "past relationships that he had had with women." Kara Dec. ¶6.

Krista says she noticed that Casey and Kara had "quickly developed a very close relationship that seemed not like a teacher and student relationship but like a boyfriend and girlfriend relationship." According to Krista, "Kara sat with Casey every day during his eighth period hall duty," "they were always talking intently," and "[s]ometimes I saw them grabbing hands or hugging." Moreover, Krista states that she "began to hear kids at school making comments that something was going on" between them. Krista Dec. ¶ 7. Krista states that her sister "seemed to like the attention from Casey and spent increasing amounts of time with him as the year went on." Kara states that Casey's attention at first made her feel "flattered and happy," but "as the school year went on," and Casey "led me to believe that he thought of me as more than a friend," she began to feel confused too. Kara Dec. ¶ 7.

Casey's "relationship" with Kara apparently soon "progressed" (for lack of better words) past the boundaries of the high school. When Kara got sick "[s]hortly before mid-term

exams," Casey allegedly called her house on both days she stayed home, spoke with her mother, offered his tutoring services, and gave his home telephone number. Kara Dec. ¶8. "During the mid-term examination period," states Kara, Casey "asked me to meet him in his empty classroom after my exam," gave her a card "in which he had written a romantic message to me," and "hugged me and kissed me." Kara Dec. ¶9. In December of that year Casey allegedly asked Kara for her photograph; when she gave him one of both her and her sister, Casey "told me that he put it on his nightstand by his bed." Kara Dec. ¶7. Kara also alleges that that winter, Casey showed up at two of her weekend indoor track meets held at a local college "to see me compete," although "it was unusual for a teacher to attend these meets." Kara Dec. ¶11.

Kara states that her parents and sister "bec[ame] increasingly upset about my involvement with Casey as the school year went on." Kara Dec. ¶12. Although nobody in the Tesoriero family had previously discussed the matter with any member of the high school staff, Krista states that in January she requested to meet with Dr. Fazio, the high school psychologist, to discuss the situation. Krista Dec. ¶ 16. Krista alleges that she told Fazio "that I was very concerned about Casey's relationship with Kara because she was frequently visiting with Casey outside of class," but Fazio "dismissed my comments about Casey and said something that implied that the relationship with Casey was good or safe for Kara." Krista Dec. ¶ 16. Krista further states that "[a]fter I spoke with Dr. Fazio, my mother also had a conversation with her," to "express her concerns." Krista Dec. ¶ 17. At about the same time, Krista apparently also arranged for Kara to talk with Fazio. Kara says she met with Fazio in February, and discussed

"what was going on with Casey," although at that time Kara did not view Casey's behavior as inappropriate or problematic. Kara Dec. ¶12. Fazio apparently took no action to investigate or report Casey's alleged conduct, instead referring the Tesorieros to a psychologist outside the high school. Fazio Dep. 14-15; Krista Dec. ¶ 17.

The Tesorieros claim that on Valentines Day 2001, Casey gave Kara "a card, a teddy bear and chocolates in a heart shaped box." Krista Dec. ¶ 18. When the Tesorieros' parents discovered the gifts soon after, they were apparently "very upset," and Michael Tesoriero, the plaintiffs' father, telephoned Casey "to tell him directly that his behavior was unacceptable." Casey allegedly promised to "stop his special attention" to the Tesorieros. Krista Dec. ¶ 19; M. Tesoriero Dec. ¶ 9. "Immediately after" his conversation with Casey, Michael Tesoriero claims to have called Assistant Principal Collins. According to Michael Tesoriero, he "described . . . the special attention that Casey had been paying my daughters," "told him what Casey said to me on the telephone," and "told Collins that I wanted him to take the appropriate action." He says that Collins promised that he would "get back to me." Collins denies receiving this call.

According to Kara, after the Valentine's Day episode, "Casey continued to ask me to come sit with him during eighth period and to see me before and after school when possible. . . . [W]e sat together every day in the hallway." Kara Dec. ¶15. On the Tesorieros' birthday in April, Casey allegedly presented both Kara and Krista with "Cheesecake Factory" cheesecakes in front of the whole class, and wrote on the blackboard "April 15, 1984 a day that changed the world forever twice. Happy Birthday Kara. Happy Birthday Krista." Kara Dec.

¶ 16; Krista Dec ¶ 20. Casey also gave Kara a bag containing two CDs and a bottle of skin lotion. Kara Dec. ¶ 16. Krista states that she was "very embarrassed since [Casey] never bought a birthday cake or recognized the birthday of anyone else in the class in such a public manner." Krista Dec. ¶ 20. Kara states that "other kids in the class noticed . . . and made comments." Kara Dec. ¶ 16. She also "later discovered that [Casey] had even asked my friend, Jen Goodman to tell him what my favorite kind of cheesecake was. Kara Dec. ¶ 16.

The Tesorieros' parents "were very angry about the birthday presents," and Michael Tesoriero called the high school to complain; he spoke to Collins. According to Collins's deposition testimony, Michael Tesoriero told him: (1) that "he was very concerned because he felt that Mr. Casey was overly involved with his daughters in the form of giving them gifts, tutoring them for free and making phone calls to the home"; (2) that "in February he had discussed this with Mr. Casey, . . . [and] indicated to him that . . . from that point on he wanted Mr. Casey to have no more contact with his daughters than he would have with every other student"; (3) that "[on] the girls' birthday . . . [Casey] had given both of them gifts, cheesecakes. And in Kara's case, CDs and some type of body lotion"; (4) that Casey "had showed up at a track meet I think that possibly both girls — but at least Kara was competing in"; and (5) that "[Mr. Tesoriero] wanted something done more formally by the school district at this point." Collins Dep. at 15-20.

In response to Michel Tesoriero's call, Collins and Principal Schneider arranged a meeting with Casey, which he attended with his union representative. Deft. 56.1 ¶10. According to Collins, at the meeting "Schneider reviewed the concerns that Mr. Tesoriero

had . . . and indicated to [Casey] from that point on basically the same guideline that Mr. Tesoriero had given him in February, which was . . . not to have any more contact with Kara and Krista than he would have with every other student." Collins Dep. at 23-24. Schneider's notes from the meeting stated that "Mr. Tesoriero had spoken back in February with Mr. Casey regarding the fact that one of his girls had developed a romantic crush with him and that this was making the family unstable." Schneider Dep. at 40. Schneider states that, "I explained to Casey the need to stop treating these girls differently than the rest of his students and that he needed to be very careful how he handled himself around the girls." Casey Dep. at 40. Casey "assured me that he would do so and basically that was the end." Schneider Dep. at 36-37. Schneider did not discuss with Casey "what would happen to him if there were any more complaints about his behavior with respect to the Tesoriero girls," and explained that "[u]sually I don't warn people like that. Everybody knows that we just follow procedures." Schneider Dep. at 43.

At his deposition, Collins was unable to remember whether Casey acknowledged "that he had been paying unusual attention to the girls," but clearly recalled "that he disputed the body lotion gift, that he hadn't given them that gift or given Kara that gift." Collins Depo at 24. Schneider likewise recalled that Casey denied giving Kara body lotion. Schneider Dep at 42. Yet the next day, according to Collins, "the parents were coincidentally in for what we call a junior planning meeting. . . . And at the end of the meeting, . . . [Michael Tesoriero] gave the guidance counselor a manila envelope that contained the CDs and the body lotion gifts and he asked her . . . to give them to me. . . . [And] I gave them to Dr. Schneider."

Collins Dep. at 24-25. Collins states that he advised the guidance counselor "just to kind of keep an eye on the girls and that they were going through a difficult situation and, you know, just be aware as to whether they would need any kind of support or help or anything like that." He also asked the guidance counselor "[t]o let me know if they did report anything about Mr. Casey, but I didn't give her any of the details of my conversations with Mr. Tesoriero." Casey Dep. at 25-26.

The Tesorieros claim that neither Schneider nor Collins did anything following that meeting to ensure that Casey's inappropriate conduct had ceased, and according to Kara, "Casey did not change his behavior at all," and continued to see her every day during her free period. Kara Dec. ¶ 18. Kara also claims that after the meeting Casey "blamed my sister for the fact that my parents complained to the school," "said she was a snitch," "was very angry with her," and "ignored her and spoke only to me when the three of us were together." Kara Dec. ¶ 20.

In June of that year, Kara says that Casey "told me how much he would miss me over the summer," and "tried to give me a CD that he said had a song on it that expressed his feelings for me but I did not take it because I knew how upset my parents would be if they found out." Kara Dec. ¶ 21. Casey also wrote Kara a letter stating in part: "It's early in the morning and I'm awakened by thoughts of you . . . my heart beats in anticipation of seeing you again"; "I miss your smile, your beautiful eyes, your laughter, your touch . . . Sometimes I wish I could wave a wand and you'd magically be here, right by my side, so I could look into your beautiful eyes"; and "I want to thank you for everything you've done for me, everything your

are to me, and for all the wonderful feelings I never would have known if not for you." Kara states that "[b]ecause I was confused by my relationship with Casey, I spoke to my former science teacher Mr. Dolley. I trusted Mr. Dolley more than anyone else at school." Kara "described our relationship and told Mr. Dolley about the CD Casey wanted to give me. I showed the letter that Casey wrote to me to Mr. Dolley." Kara Dec. ¶ 21.

According to Collins's deposition testimony, on June 8 Dolley informed him of this conversation with Kara; related to him the content of Casey's letter to her, describing it as "over the line"; and additionally told Collins that he had observed Kara and Casey conversing in the school hallway, and "felt uncomfortable when he was observing them, that it just didn't look like the way a student and a teacher would normally interact with each other." Collins Dep. at 27-28. Collins states that he "went down right away" and reported to Schneider "everything" that Dolley had told him. According to Collins, Schneider "indicated that he would follow up," but Collins had no knowledge of what, if anything, Schneider subsequently did. Collins Dep. at 29. Collins said nothing to Casey about the discussion with Dolley, as "[i]t really was not my responsibility to do that . . . normally it would be . . . either the building principal or . . . somebody above him." Collins Dep. at 30. Schneider recalls hearing Collins "saying something that Mr. Dolley had a certain perception" from having "seen them talking to each other"; but Schneider states that "the way that he reported it to me, it did not appear to be a very urgent situation since I knew that, you know, he was her teacher still," and "teachers talk with kids all the time, so there's really nothing inappropriate about it." Schneider Dep. at 46-49. No action was taken at that point regarding Casey by Schneider, Collins, or anybody

else.

During the summer of 2001, Casey and Kara spoke by telephone "almost every night," sometimes for over an hour; according to Kara "[a]s the summer went on we began to speak more frankly about our relationship. He told me that whether or not we would have sex would be up to me. I asked him if he loved me and he told me that he did." Kara Dec. ¶ 22. According to Michael Tesoriero, "[i]n late August or early September, I received bills for Kara's cellular phone with the same number appearing on it numerous times and for very long conversations. Kara ran up a $500 cell phone bill over and above her free minutes. After I discovered that the number she was calling was Casey's, I took away her cell phone. There was a romantic voice mail message on the phone from Casey, which I later had transcribed and taped." Michael Tesoriero Dec. ¶ 20.

It is undisputed that on September 10, 2001, the Tesorieros' parents presented the bill and the recorded message to Schneider and Collins; that Casey was reassigned effective the next day and directed not to report to the high school until further notice; that Casey was later brought up on disciplinary charges and suspended without pay for one year; and that Casey has had no subsequent contact with either Kara or Krista.

According to their complaint, the Tesorieros have suffered "pain, anguish, and mental distress," as a result of the Defendants' conduct, "requiring them to seek treatment from a mental health professional"; they brought the present action on August 2, 2002. On November 15, 2004, both Defendants filed the present motion to dismiss.

I.       *Summary Judgment: Legal Standards*

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 67 (2d Cir. 1998). It is the responsibility of the party moving for summary judgment to offer admissible evidence in the form of pleadings, depositions, answers to interrogatories, admissions, or affidavits showing the absence of any genuine issue of material fact. *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994) (quoting Fed. R. Civ. P. 56(c)). It is the responsibility of the party opposing summary judgment to offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The responsibility of a district court deciding a motion for summary judgment is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). The court must therefore resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing a summary judgment motion. *Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). "If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable." *Folkes v. N.Y. Coll. of Osteopathic Med.*, 214 F. Supp.2d 273, 279 (E.D.N.Y. 2002) (citing *Holt v. KMI-Cont'l,*

*Inc.*, 95 F.3d 123, 128 (2d Cir. 1996).

Nevertheless, a party opposing summary judgment must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)), or "some metaphysical doubt as to the material facts." *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), but is certainly not unobtainable. "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

II.    *Title IX*

The Tesorieros' first cause of action is brought pursuant to Title IX of the Education Amendment of 1972, 20 U.S.C. § 1681 et seq., which provides in relevant part: "No person in the United States shall, on the basis of sex, be . . . subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

"Discrimination" is defined to include "hostile educational environment sexual harassment," *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp.2d 304, 314 (S.D.N.Y. 2000) (citations omitted), and this is apparently the basis of the Tesorieros' Title IX claim.

To state a hostile educational environment harassment claim under Title IX, a plaintiff must allege that she was subjected to "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature," and that this behavior was "sufficiently severe or pervasive" to alter the conditions of her educational environment and to create an abusive educational environment, analyzed from the perspective of a reasonable person. *Id.* (citations omitted). The Defendants do not dispute that the District is a recipient of federal education funding. Nor do they dispute that the Tesorieros have alleged behavior by Casey that could be sufficiently severe or pervasive to alter the conditions of their educational environment and create an abusive educational environment.

A. *Because individuals cannot be liable under Title IX, any Title IX claims against Casey must be dismissed.*

As an initial matter, to the extent that the Tesorieros' are asserting any Title IX claims against Casey, they may be swiftly dispatched. Although the Second Circuit does not seem to have definitively addressed this issue, the overwhelming majority of federal courts that have, both in this Circuit and elsewhere, have held that "only the institutional recipient of federal funds can be held liable under Title IX"; "individuals, who are not recipients, cannot be held liable." *Folkes v. N.Y. Coll. of Osteopathic Med.*, 214 F. Supp.2d 273, 282 (E.D.N.Y. 2002); *see also Hayut v. State Univ. of N.Y.*, 127 F. Supp.2d 333, 338 (N.D.N.Y.2000) (citing

cases from First, Seventh, and Eighth Circuits, and numerous federal district courts).  The Tesioreros appear to concede this argument.  Accordingly, Casey's motion for summary judgment on this issue must be granted, and the Title IX claims against him — to the extent that there are any — must be dismissed.

B.    *Summary judgment for the District on the Tesorieros' Title IX claim is unwarranted.*

In cases (like this one) involving no allegations of an official policy of sex discrimination, a federally-funded educational institution can still face Title IX liability for a teacher's sexual harassment of a student.  But in such cases the plaintiff must show that "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998).  The District argues that only Principal Schneider had such corrective authority at the high school, and that prior to September 10, 2001, he had no actual notice that Casey had been harassing the Tesorieros.  The District further argues that because Schneider took prompt action against Casey on that date, he cannot have been deliberately indifferent to Casey's misconduct.

Even assuming that Schneider was in fact the only person at the high school with the authority to correct Casey's misconduct, there are triable issues of fact as to (1) whether Schneider had actual notice of misconduct by Casey prior to September 10, 2001; and assuming that he did have such notice, (2) whether Schneider acted with deliberate indifference.  Accordingly, the District's motion for summary judgment must be denied on the

Tesorieros' Title IX claim.

> 1.  *Whether the District had "actual notice" of Casey's misconduct is a question of fact.*

"Although the actual knowledge standard has been applied repeatedly by courts since *Gebser v. Lago Vista Indep. Sch. Dist.*, its contours have yet to be fully defined." *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp.2d 304, 320 (S.D.N.Y. 2000) (citing *Gebser*, 524 U.S. 274)). Accordingly, "[i]t is difficult to define what kind of notice is sufficient." *Doe A. v. Green*, 298 F. Supp.2d 1025, 0134 (D. Nev. 2004).

As the District argues, Title IX liability does not attach simply because a school "should have known" about sexual abuse, *see P.H. v. Sch. Dist. of Kansas City, Mo.*, 265 F.3d 653, 663 (8th Cir. 2001) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642 (1999)), and actual notice also "requires more than a simple report of inappropriate conduct by a teacher." *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp.2d 57, 63 (D. Me. 1999). "Clearly, the institution must have actual knowledge of at least some incidents of harassment in order for liability to attach," and "at minimum must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Crandell*, 87 F. Supp.2d at 320.

But most courts agree that "[o]n the other hand, the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student." *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp.2d at 63. As one district court has stated, "[a]t some point between these poles a

supervisory school official knows, or it should be obvious to him or her, that a school employee is a substantial risk to sexually abuse children." *Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp.2d 1077, 1083 (S.D. Iowa 2000) (citing *id.*). Most federal courts appear to agree that the "actual knowledge" need only be of facts indicating that the teacher has *the potential* to abuse a student. *See Doe A. v. Green*, 298 F. Supp.2d at 1034 n.2 (listing cases).[1]

Whether complaints "unsubstantiated by corroborating evidence and denied by the allegedly offending teacher" did or should have put a school district on notice of a teacher's substantial risk to students "is usually a question for the jury." *Hart v. Paint Valley Local Sch. Dist.*, No. 01 Civ. 04, 2002 WL 31951264, at *6 (S.D. Ohio Nov. 15, 2002). In *Doe A. v. Green*, the most factually analogous case that this Court has located, a student's parent notified the school principal that a teacher "had been making sexual innuendos in conversations with [his daughter], had been 'touchy' with her, and had been inviting her to after-school activities"; two members of the faculty also reported suspicious or somewhat inappropriate behavior between the teacher and student. 298 F. Supp.2d at 1034. The district court held that "[i]f the Plaintiffs are able to prove their allegations concerning the reports made to the school district, . . . a reasonable jury could conclude that those reports were sufficient to establish acts of sexual harassment of which school officials had actual notice."

---

[1]     The Fourth Circuit disagrees, and has held that held that the notice requirement in *Gebser* mandates a showing that school district officials actually knew that the specific discriminatory conduct in question was occurring. *Baynard v. Malone*, 268 F.3d 228, 237-38 (4th Cir. 2001). But no other jurisdiction appears to have followed this holding, and at least one court in this district has explicitly declined to follow it. *See Folkes v. New York Coll. of Osteopathic Med.*, 214 F. Supp.2d 273, 283-84 (E.D.N.Y. 2002).

-17-

*Id.*

In the present case, the Tesorieros have presented strong evidence that by the time of his April 2001 meeting with Casey, Schneider knew that Casey had given the Tesorieros gifts (including body lotion), offered to tutor them for free, telephoned their home, and arrived at their track meets; Schneider had also heard that the Tesorieros' father had called Casey and demanded that he stop. The record also strongly suggests that Schneider knew or should have known that Casey lied at the April meeting about whether he had ever given Kara the bottle of body lotion, since Kara's parents presented it to Collins the very next day. The Tesorieros have also presented strong evidence that on June 8, 2001, Schneider received a credible report that a teacher had observed Kara and Casey interacting in a manner suggesting romantic involvment, and had seen a letter from Casey to Kara written in terms that were "over the line." This is sufficient evidence to create a triable issue of fact as to whether the District had actual notice of Casey's potential to harass Kara Tesoriero. Accordingly, summary judgment cannot be granted on the basis of any lack of actual notice.

> 2. *Whether the District acted with "deliberate disregard" to the reports of Casey's misconduct is also a question of fact.*

To be liable in damages, an educational institution must have "effectively caused" the complained-of discrimination through its own "deliberate indifference." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 632-43 (1999) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998)). "That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 645

(quotations omitted).

"Deliberate indifference" is more than a "mere reasonableness standard that transforms every school disciplinary decision into a jury question," *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999), and "describes a state of mind more blameworthy than negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). But "deliberate indifference" is also "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. "Deliberate indifference may be found both when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances, and when remedial action only follows after a lengthy and unjustified delay." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003) (internal quotations omitted). "Deliberate indifference will often be a fact-laden question," for which bright lines are ill-suited. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 457 n.12 (5th Cir. 1994); *see also Doe A. v. Green*, 298 F. Supp.2d 1025, 1035-36 & n.4 (D. Nev. 2004) (stating that no bright line rule in Ninth Circuit cases defines "deliberate indifference," and from review of cases outside Ninth Circuit, "it is clear that most courts have similarly not discovered such a bright-line").

Where an educational institution "takes timely and reasonable measures to end the harassment," it is not deliberately indifferent. *See Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999). The measures need not have been ultimately effective in preventing subsequent misconduct, so long as they were taken in good faith. *See Sauls v. Pierce County Sch. Dist.*, 399 F.3d 1279, 1285 (11th Cir. 2005) (citing *Doe v. Taylor Indep. Sch. Dist.*, 15

F.3d at 456 n. 12). But a Title IX entity's response must be more than "minimalist," *Vance v. Spencer County Public Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000), and where an educational institution "either fails to act, or acts in a way which could not have reasonably been expected to remedy the violation, then the institution is liable for what amounts to an official decision not to end discrimination." *Doe A. v. Green*, 298 F. Supp.2d at 1035.

The body of applicable case law indicates that a principal receiving reports of possible teacher-to-student sexual harassment does not act with deliberate indifference where he or she promptly investigates, institutes corrective measures, and subsequently continues to monitor the situation. *See, e.g.*, *Sauls v. Pierce County Sch. Dist.*, 399 F.3d 1279, 1285 (11th Cir. 2005) (citing *Davis v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1373-75 (11th Cir. 2000)). But "where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior." *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000); *see also Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir. 1999) ("if [an institution] learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability").

The Court finds *Doe A. v. Green* to be the most persuasive precedent on this issue as well. *See* 298 F. Supp.2d at 1035. In that case, after receiving complaints regarding a teacher's harassment of a student, the principal "counseled [the teacher] to remain professional at all times and not communicate personal feelings to students," and told the victimized student's father that he would "monitor the situation and take care of the problem."

-20-

*Id* at 1029. However, the plaintiffs alleged that the principal subsequently failed to refer the matter to any government officials, monitor the teacher, or follow-up with the student to check if she continued to have "inappropriate interactions" with the teacher. *Id.* Considering the facts in the light most favorable to the plaintiffs opposing summary judgment, the court had little trouble concluding that "a reasonable jury could find the Defendants' conduct constituted deliberate indifference." *Id.* at 1036.

In this case, as in *Doe A.*, there is no indication that subsequent to his April meeting with Casey, Schneider did *anything* to track Caseys' behavior toward the Tesorieros — which, at least in Kara's case, continued to be both improper and quite public. Collins apparently asked the guidance counselor to check up on Kara and Krista, but did not do so himself. And even after receiving complaints in June from another teacher through Collins regarding the letter and CD that Kara received from Casey, Schneider did nothing. In light of these facts, there is clearly a triable issue as to whether Schneider was deliberately indifferent toward the Tesorieros. Accordingly, the District's motion for summary judgment must be denied on this ground as well.

III.    *Section 296 of the New York Human Rights Law*

The Tesorieros' second cause of action is brought pursuant to Section 296 of the New York Human Rights Law (NYHRL, NYSHRL, or HRL). As the District argues, this cause of action must be dismissed.

The overall purpose of the Human Rights Law is to bar discrimination against

persons based upon their personal attributes. *Capasso v. Metro. Transp. Auth. of State of N.Y.*, 198 F. Supp.2d 452, 465 (S.D.N.Y. 2002) (quoting *Bruno v. Pembrook Mgmt., Inc.*, 628 N.Y.S.2d 971, 975 (App. Div. 1995)). To this end, the statute contains numerous subdivisions (most of which consist of multiple parts or paragraphs) addressing a myriad of discriminatory practices in various walks of life. *See generally* McKinney's Executive Law § 296.

The Tesorieros do not specify which of the NYHRL's specific parts or provisions the Defendants allegedly offended. However, the NYHRL portion of their complaint incorporates by reference and largely reiterates the Title IX-related claims. The District thus quite reasonably assumes — and the Tesorieros do not disagree — that the complaint purports to state a claim under Section 296, subdivision 4 of the law, which reads in relevant part:

> It shall be an unlawful discriminatory practice for an education corporation or association which holds itself out to the public to be nonsectarian and exempt from taxation pursuant to the provisions of article four of the real property tax law . . . to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age or marital status.

But the District argues, correctly, that Section 296, subdivision 4 is inapplicable to the present case, because "sexual harassment by a teacher against a student was not a violation of the HRL until its provisions were amended effective July 1, 2003."

The NYHRL does not apply retroactively to acts preceding the effective date of its applicable provisions. *See*, *e.g.*, *Kwarren v. Am. Airlines*, 757 N.Y.S.2d 105, 105 (App. Div. 2003), *and Martinez-Tolentino v. Buffalo State Coll.*, 715 N.Y.S.2d 554, 554 (App. Div.

2000).  The Tesorieros do not actually dispute that prior to its amendment in 2003, no section

of the law expressly prohibited the sexual harassment of a student by a teacher or educational

institution.  *See Hayut v. State Univ. of New York*, 217 F. Supp.2d 280, 291 (N.D.N.Y. 2002)

(*vacated in part on other grounds*, 352 F.3d 733 (2d Cir. 2003).  They also do not dispute

that all of the relevant events in this case occurred prior to 2003.

In opposing the District's motion, the Tesorieros argue that "[c]laims of

educational discrimination arising under the NYSHRL are analyzed consistently with federal

law."  It is true, as a general rule, that NYHRL discrimination claims are evaluated using the

same *analytic framework* as federal discrimination actions.  *See Farias v. Instructional Sys.,

Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) (analyzing race- and national origin-based NYHRL

employment discrimination claim under same framework as Title VII employment

discrimination claims).  But that does not mean that there are no *substantive* differences

between the two statutes.  *Cf. Heskin v. Insite Adver., Inc.*, No. 03 Civ. 2598, 2005 WL

407646, at *13 & n.21 (S.D.N.Y. Feb. 22, 2005).  The federal analytic framework only applies

once a plaintiff has stated a colorable claim; where the plaintiff's cause of action simply does

not exist under the relevant governing law, there is no need to analyze it at all.  The Tesorieros'

other arguments on this point are baseless or unhelpful.[2]

_____

[2]        The Tesorieros claim that "[c]ontrary to the District's argument, the Court in *Bucklen*,
which predates the 2003 amendment of § 296 subd. 4, specifically allowed the NYSHRL claim to
proceed along with the Title IX claim based on sex."  But the "claim based on sex" in *Bucklen v.
Rensselaer Polytechnic Inst.*, 166 F. Supp.2d 721 (N.D.N.Y. 2001) was brought by a male graduate
student claiming that the defendant's refusal to allow him to re-take a failed exam, a courtesy allegedly
extended to female students, rendered him ineligible for a teaching assistant position, and was thus a

-23-

Because all of the alleged incidents in the present case occurred in the years 2000 and 2001, well before Section 296(4) the NYHRL was amended in 2003 to allow students to sue for sexual harassment by a teacher, and because the NYHRL's provisions do not apply retroactively, the District's motion for summary judgment on this point is granted, and the Tesorieros' second cause of action must be dismissed.[3]

III.    *Negligent Hiring, Retention, and Supervision*

The Tesorieros' third cause of action alleges that the District was negligent in its hiring, retention, or supervision of Casey "because they had knowledge of Casey's propensity to engage in the type of behavior that caused the plaintiffs' injuries." The parties implicitly (and correctly) agree that this claim is governed by New York common law. *See*, *e.g.*, *Holmes v. Lorch*, 329 F. Supp.2d 516, 529-30 (S.D.N.Y. 2004) (citations omitted). The parties also agree that to prevail on a negligent hiring, retention, or supervision claim under New York law, the plaintiff must show that the defendant/employer knew or should have known of its employee's propensity to engage in the injurious conduct in question. *See Kenneth R.*

---

form of *employment discrimination*. *Bucklen* did not involve *sexual harassment*.

The Tesorieros also argue, correctly, that the District erroneously relies on *State Div. of Human Rights v. Bd. of Co-op. Educ. Servs.*, 470 N.Y.S.2d 209 (App. Div. 1983). As the Tesorieros argue, that case (1) does *not* stand for the proposition that prior to 2003 a state educational entity was not subject to suit for a teacher's sexual harassment of a student, (2) was based on a different provision of the NYHRL, and (3) did not actually involve sexual harassment. But the inapplicability of that specific case does not make the District's overall legal argument on Section 296, subdivision 4's inapplicability to the present dispute incorrect.

[3]    The Tesorieros appear to bring this cause of action against the District only. To the extent that they intended this claim to apply it to Casey as well, it fails against him for the same reasons as it fails against the District.

*v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791, 791 (App. Div. 1997).   Where the plaintiff fails to make such a showing, summary judgment for the defendant is appropriate.  *See Doe v. Whitney*, 779 N.Y.S.2d 570, 572 (App. Div. 2004).   As this paragraph suggests, negligent hiring, retention, and supervision share common elements, and are often analyzed as a single issue.   But the terms "hiring," "retention," and "supervision" also refer, obviously, to distinct aspects of an employment relationship that may be examined separately for negligence, when (as here) it is appropriate.   *See*, *e.g.*, *id.* (granting summary judgment on negligent hiring claim, but denying summary judgment on negligent supervision claim).

A.      *Any negligent hiring claim against the District must fail.*

It is common sense that an employer should only be liable for the negligent hiring of an employee if he knew or should have known of the employee's tortious propensities *at the time of hiring*.   *See Estevez-Yalcin v. Children's Vill.*, 331 F. Supp.2d 170, 175 (S.D.N.Y. 2004).   The Court notes that, as the District argues, "there are no facts to indicate that [it] knew or should have known about Casey's alleged propensity to sexually harass female students when he was hired," and the Tesorieros do not appear to disagree.   Thus, to the extent that "negligent hiring" is considered as a separate claim, it must be dismissed.

B.      *Summary judgment is unwarranted on the negligent retention claim.*

To avoid summary judgment on the issue of negligent retention, as the word "retention" suggests, a plaintiff must offer evidence that the defendant negligently failed to terminate an employee — that is, that the defendant knew or should have known of the employee's propensity to commit acts meriting dismissal, yet failed to act accordingly.   *See*

*Wall v. Del., Lackawanna & W. R.R. Co.*, 7 N.Y.S. 709, 710-11 (Sup. Ct. 1889). Where there is some evidence that a school district "knowingly kept [a teacher] in its employ knowing of prior inappropriate advances toward students," the school district is not entitled to summary judgment on a student's negligent retention claim. *Colon v. Jarvis*, 742 N.Y.S.2d 304, 304 (App. Div. 2002). In the present case, Schneider and Collins clearly knew of Casey's inappropriate advances toward the Tesorieros from at least April 2001. Whether these advances warranted termination then, or at any other time prior to September 10, 2001 is unclear, however. Accordingly, summary judgment is inappropriate on this claim.

C.  *Summary judgment is unwarranted on the negligent supervision claim.*

A school district has the duty to exercise the same degree of care over the pupils under its control as a reasonably prudent parent would exercise under the same circumstances, and a breach of this duty may form the basis for a claim for negligent failure to supervise. *See Murray v. Research Found. of State Univ. of N.Y.*, 723 N.Y.S.2d 805, 807 (App. Div. 2001), *and Doe v. Whitney*, 779 N.Y.S.2d 570, 572 (App. Div. 2004). The duty to supervise apparently encompasses the supervision of *teachers* as well as students, to the extent that teachers present known or knowable potential threats to the students' well-being. *See Doe v. Whitney*, 779 N.Y.S.2d at 572. The standard for determining whether this duty was breached is whether "a parent of ordinary prudence placed in the identical situation and armed with the same information would invariably have provided greater supervision." *Murray*, 723 N.Y.S.2d at 807 (citation omitted). Although this is a somewhat heightened standard of care, a plaintiff's injury must still have been "reasonably foreseeable," *see Estevez-Yalcin v. Children's Vill.*,

331 F. Supp.2d 170, 176 (S.D.N.Y. 2004) (citations omitted), and proximately related to the school's failure to provide adequate supervision. *See Dia CC v. Ithaca City Sch. Dist.*, 758 N.Y.S.2d 197, 197 (App. Div. 2003). Negligent failure to supervise is thus, obviously, a fact-intensive determination.

New York courts have held that a fact-finder could reasonably conclude that a school negligently failed to supervise a sexually-abusive teacher, where the teacher often kept the student victim in his classroom at recess, or removed him from other classes on a weekly basis without explanation but with the consent of the other teachers. *See Doe v. Whitney*, 779 N.Y.S.2d at 572. Similarly, New York courts have denied summary judgment on a negligent supervision claim against an institution that allowed an instructor to release a student not enrolled in that instructor's course from another class every week over a six-month period, in order to meet with him alone in a room with the door closed, in contravention of district policy. *See Murray*, 723 N.Y.S.2d at 807.

In the present case, it is clearly a triable issue of fact whether Schneider, acting with a reasonable parent's prudence and knowing of the reports of Casey's prior behavior, would have allowed him to continue teaching and meeting with Kara Tesoriero at all — much less with no supervision. Further, in this case the Tesorieros' parents expressly demanded that Casey have no further such interactions with their daughters, lending added credence to the notion that reasonable parents would have supervised Casey's behavior more carefully. Accordingly, summary judgment is unwarranted on this claim as well.

IV.    *Intentional Infliction of Emotional Distress*

The Tesorieros' final cause of action is for intentional infliction of emotional distress. To state a prima facie case for the intentional infliction of emotional distress, a plaintiff must demonstrate: (1) extreme and outrageous conduct by the defendant, (2) that was intended to cause, (3) and that did cause, (4) severe emotional distress. *Niles v. Nelson*, 72 F. Supp.2d 13, 22 (N.D.N.Y. 1999) (citing *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996); and *Howell v. New York Post Co.*,612 N.E.2d 699, 702 (N.Y. 1993)).

At least in the abstract, "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Bender*, 78 F.3d at 790. According to the New York Court of Appeals, liability will be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Howell*, 612 N.E.2d at 702. But as the Second Circuit has noted, some lower New York courts have sustained, at least against dismissal motions, emotional distress claims that allege conduct that is at least "somewhat less than 'utterly intolerable in a civilized society,' " *Bender*, 78 F.3d at 791 (citing cases involving " 'hang-up' telephone calls," "taunting letter from former boyfriend, boasting of marriage," and "driving too closely and making threatening looks"). In light of these latter cases, Casey's conduct — which was undeniably inappropriate, and also quite lecherous — might well suffice.[4]

---

[4]    *But cf. Niles*, 72 F. Supp.2d at 23 (finding "a complete absence of evidence from which a fair minded trier of fact reasonably could conclude that [a defendant teacher] engaged in

-28-

The Tesorieros' intentional infliction of emotional distress claim must fail, however, because they offer no evidence to support the second element of the cause of action: that Casey (or the District, for that matter) ever *intended* to cause them severe emotional distress. The Tesorieros argue that "the issue of whether Casey in fact intended to cause plaintiffs severe emotional distress is a question of fact for the jury." But that is only true if, in response to Casey's summary judgment motion, the Tesorieros have offered admissible evidence indicating an actual factual issue as to Casey's intent. They have not. As noted in Part I, *supra*, a plaintiff cannot defeat summary judgment based solely on the unsupported allegations in her pleadings, her conclusory statements, or "the mere incantation of intent or state of mind."[5] Accordingly, summary judgment is granted as to the Tesorieros' intentional infliction of emotional distress claim.

## CONCLUSION

For all of the reasons above, Defendant Casey's motion for summary judgment

---

extreme or outrageous behavior despite allegation of his (1) frequent and profane sexual comments regarding physical appearance and anatomy of female student plaintiff, other females in class, and female teachers in school; (2) encouragement of male students to behave in similar fashion; and (3) removal of female students from class for remainder of school year following their complaints to school administration).

[5] In certain extreme instances a complaint need not allege directly that a defendant's conduct was motivated by the intent to cause severe emotional distress, because the defendant's actions themselves allow a clear inference the they were so intended. *See Persaud v. S. Axelrod Co.*, No. 95 Civ. 7849, 1996 WL 11197, at *1-2, 4 (S.D.N.Y. Jan. 10, 1996) (where complaint states that defendant "waved his knife back and forth close to [plaintiff's] face and neck" and "screamed at her for refusing to go out with him and accused her of sleeping with other men in the office," plaintiff need not specifically allege intent to cause emotional distress). The Tesorieros have not demonstrated that this is such a case.

on all of the claims asserted against him is GRANTED; Defendant Syosset Central School District's motion for summary judgment is GRANTED IN PART, as to the Plaintiffs' New York Human Rights Law claim, and Intentional Infliction of Emotional Distress claim, but DENIED IN PART, as to the Plaintiffs' Title IX and negligence claims. The Clerk of Court is directed to remove Defendant Casey from the docket.

      **SO ORDERED.**

Dated:  Central Islip, New York
      August 8, 2005

                                                         /s/
                                                         Denis R. Hurley
                                                         United States District Judge